AMERICAN STATE BANK, Trustee under the Last Will and Testament of Ruth M. Kupfer, Deceased, Petitioner-Appellee, *v.* SYLVAN L. KUPFER, JR., *et al.*, Respondents-Appellants—(Melissa Kupfer *et al.*, Respondents).

Fourth District    No. 4—82—0404

Opinion filed May 24, 1983.

Michael A. Barford, of Bloomington, for appellants.

James W. Yoder, of Yoder, Yoder, Zanoni, Flynn, Prall & Willard, of Bloomington, for appellee.

William Paul, of Bloomington, guardian *ad litem*.

JUSTICE MILLS delivered the opinion of the court:

"Family Feud" goes to the theatre.

A brother and sister at an impasse over the sale of trust property—the Normal Theatre.

The trial court authorized the sale.

We affirm.

The trustee sought authority to sell the Normal Theatre—the sole asset of a trust—against the wishes of the present beneficiary, whose acquiescence is required by the terms of the trust before the realty can be sold. After a bench trial, the trial court entered an order authorizing the sale and respondents Sylvan L. Kupfer, Jr., and Mary Jane Kupfer appeal.

The evidence below was uncontroverted. In 1965, Ruth M. Kupfer,

by her will, created two trusts, one of which was for the benefit of her son, Sylvan L. Kupfer, Jr., for a period of 21 years after her death. Upon termination of the trust, the assets were to be distributed one-fourth to Sylvan, one-fourth to Mary Jane Kupfer (Sylvan's wife), and the remaining one-half to be divided equally among Sylvan's children. The sole asset placed in the trust was Ruth's one-half interest in the Normal Theatre (the Theatre). (Ruth had previously transferred the other one-half interest in the Theatre to her daughter, Joan E. Kupfer.) The trustee was not to sell the Theatre without the consent of Joan *and* Sylvan.

Ruth died in 1965. American State Bank was named as trustee in the will and has administered the property by leasing it to Kerasotes-Rialto Theatre Corporation (Kerasotes). Kerasotes notified the trustee that it no longer wishes to lease the Theatre. An installment sale contract was negotiated among Kerasotes, Joan, and the trustee. Under its terms Kerasotes would purchase all of the Theatre's personal and real property for $150,000, to be paid over 10 years after a 10% down payment, with interest on the unpaid balance accruing at 12%. Sylvan refused to agree to the sale and the trustee petitioned the circuit court of McLean County for instructions, with Sylvan, Mary, Joan, Melissa Kupfer (Sylvan's adult and sole child) and the unborn children of Sylvan, named as respondents. A guardian *ad litem* was appointed for the unborn children.

The petition for instructions alleged that no tenants other than Kerasotes could be obtained for the premises, and that absent a tenant, the trustee could not pay insurance premiums or real estate taxes on the premises, and as a result thereof, might lose the sole asset of the trust estate.

At trial, James Drake, attorney for Kerasotes, testified that his client had no interest in the Theatre as a tenant and was continuing the lease on a month-to-month basis until its purchase offer was formally accepted or rejected. Kerasotes invests in downtown theatres only when they are in good locations and can be expanded into two-plex or three-plex theatres. Kerasotes is only interested in making such an investment in property which it owns. Downtown theatres have been closing rapidly, partially because of their inability to share in the economies of a multi-screen operation.

Gary Riss, a real estate appraiser, testified that the replacement cost approach to the appraisal of the building would result in an appraised value of between $112,000 to $115,000 for the property. There would have to be extensive remodeling for the building to have a use for any other type of commercial purpose. The sloping floor would

have to be changed to a level floor. There would have to be interior partitions, heating, ventilating, electrical and plumbing work done. His estimate of the cost range was $25,000 and up. He further testified that in his opinion the potential sale price would be less than his appraised value if the property were to be sold by the sheriff at a partition sale.

Joan testified that if the Theatre was not sold according to the proposed contract for purchase, she would bring a partition suit so that she could sell her one-half interest in the property. Her share of the rent is her primary income and would not allow her to make payments for taxes and insurance on the property if the lease with Kerasotes ran out. Neither could she pay her share of any remodeling costs.

She further testified as to her familiarity with the motion picture business, and that the trend has been to fewer and fewer independent theatres with chains buying out independent theatres or the theatres closing down. She did not know of any possible tenants for this property. The building was constructed in 1937 and has always been leased to a chain. Five different chains were contacted in an attempt to negotiate a lease. None of these contacts resulted in any interest. Joan said she was not willing to sell her interest to Sylvan on the same terms as she would be willing to sell to Kerasotes, because Kerasotes is a corporation with financial resources and stability and that she would only consider a chain because of the nature of the theatre business.

David Sullivan, a trust officer for the petitioner, testified that the will of Ruth Kupfer provided for two trusts, the Sylvan L. Kupfer, Jr., trust and the Melissa Kupfer trust. The only asset in Sylvan's trust is the one-half interest in the Theatre.

The trusts are to terminate in March 1986, 21 years after the death of Ruth. Sylvan's trust does not have funds on hand to remodel the property for any other use; there is no principal or corpus on hand for remodeling or renovation; and, absent a tenant, there will be no funds for paying taxes, insurance, and utilities. The trust termination date of March 1986 is an impediment to finding a tenant who would invest a large sum of money in the property because there would not be enough time to recapture the cost of their investment. Sullivan did not know of any way, absent the sale, to put this building to an economic use.

The income to the trust beneficiary as a result of the sale contract would be $7,800 annually. The income from the lease to the trust beneficiary was approximately $5,100 in 1980. Sullivan also described

several unfruitful contacts made with potential tenants and admitted that no advertisements for the sale of the property had been made.

The only evidence offered by respondents was the testimony of Mary. She testified about an alternative proposal for the Theatre made by her and Sylvan. They object to the sale to Kerasotes and would like to operate the Theatre as a revival house showing old movies. A specific individual investor was available to provide funds for the initial operation of the Theatre in the amount of $10,000. The terms and conditions offered to Joan, as co-owner, would be the same as Kerasotes' proposal, although the source of funds for the down payment was not identified. The operation of the Theatre by the appellants would be profitable and sufficient to provide for Joan's requirements. Over the objection of appellants' counsel, inquiry was permitted about a foreclosure of the mortgage upon Mary and Sylvan's residence. In rebuttal Joan testified that a theatre chain had turned down an offer to operate a revival house and in her opinion one cannot be successfully operated without the economies of size of a chain.

After trial the court made the following findings of fact from the bench:

> "I would note that the evidence is established that there has been a change in conditions since the drawing of the will ***. That no tenant as a lessee or tenant is presently willing and able to take over the premises. I would find that a sale to Kerasotes is feasible, and that the sale price is fair. There is a potential for no income for months to come, if Kerasotes were to withdraw as a tenant, as they have suggested by their legal representative they will. The other co-owner of the property or the owner of an undivided one-half interest is not interested in a sale on contract to family members, and has asserted to the Court under oath that she will seek partition, which is her right, and that partition would lessen the value of the asset and would waste both time and legal fees unnecessarily. The bank is the trustee before the Court, as Petitioner, and I believe it would be a breach of the fiduciary duty of a trustee to turn over a trust asset to persons who have no experience in running a movie house, nor any capital to invest in the running of such a business. If an offer were made to the Court by someone other than family members, to the bank, and the bank had to choose between the offer that the Respondents had made and the sale to Kerasotes, then the Respondents could properly object."

Appellants' main contention is that the facts here do not present

the extreme conditions necessary for a trial court to order the sale of a trust asset contrary to the terms of the trust instrument. Appellants also argue that their proposal to operate the Theatre should have been accepted; that the particular sale to Kerasotes should not have been approved; and that the court erred in the admission of the evidence regarding the foreclosure.

Appellants contend that before a court may authorize the sale of a trust asset contrary to the terms of the trust, it must be shown by clear and convincing evidence that an emergency situation exists which requires a sale to prevent the inevitable loss of the asset or destruction of the trust, and that petitioner has failed to show such an emergency exists here. Furthermore, the mere fact that a sale may result in pecuniary gain for the beneficiaries is an insufficient basis for authorization for such a sale. Appellants cite a long line of Illinois cases in support of their position. (*Curtiss v. Brown* (1862), 29 Ill. 201; *Gavin v. Curtin* (1898), 171 Ill. 640, 49 N.E. 523; *Johns v. Johns* (1898), 172 Ill. 472, 50 N.E. 337; *Dyer v. Paddock* (1946), 395 Ill. 288, 70 N.E.2d 49; *Stough v. Brach* (1946), 395 Ill. 544, 70 N.E.2d 585.) Inasmuch as we conclude that the relevant common law has been substantially modified by statute, we need not decide whether such an "emergency" exists here.

In *Curtiss*, the Illinois Supreme Court first addressed the question of whether courts of chancery have the inherent power, in cases of necessity, to order a disposition of trust estates which is not in accordance with the provisions of the instrument creating the trust. The answer was in the affirmative with the caveat that the power should be exercised with great caution, and only when unforeseen exigencies arise which might place the estate in jeopardy or place the *cestui que trust* in "pinching want." Furthermore, in departing from the explicit terms of the trust, the court should carry out what the creator of the trust would have desired if he had anticipated the existing circumstances.

Thereafter in *Johns*, the court explained that while cases subsequent to *Curtiss* authorized the conversion of trust real estate into personal property and the breaking in upon the corpus of the trust simply for "the best interest of the beneficiaries," these were special circumstances because the trusts were created for the benefit of one under disability. Normally, however, a court is not authorized to break in upon a trust, and dispose of the subject matter against the will of the donor, on the ground that the immediate beneficiaries will receive greater benefits by reason of the proposed change in the trust than would accrue to them if the trust was administered according to the

will of the donor. The beneficiary in *Johns* had desired to develop and sell a portion of real estate which composed the trust corpus in order to take advantage of the substantial rise in its value which had occurred because of encroaching urbanization. The proceeds were desired for use in raising the beneficiaries' low standard of living. The court concluded that unless preservation of the subject matter of the trust, or some like necessity, demands judicial intervention, the donor's intent should be followed, and that the evidence at hand did not present a sufficient urgency or necessity for judicial intervention.

In 1911 section 50 of the Chancery Act (Ill. Rev. Stat. 1911, ch. 22, par. 50) was amended giving chancery courts, *inter alia*, the jurisdiction to hear and determine bills to "authorize trustees to lease, mortgage and sell, improve, exchange and invest any portion or all of any trust estate *** or exercise any power *** necessary for the conservation, preservation, protection or betterment of said estate during any period of contingency ***," thus giving a statutory basis for the authority which *Curtiss* declared was inherent.

In 1929 section 50 of the Chancery Act (Ill. Rev. Stat. 1929, ch. 22, par. 50) was again amended to read in pertinent part:

> "Where lands or any estate therein are subject to contingent future interest *** whether a trust is involved or not, and it is made to appear that such lands or estate are liable to waste or depreciation in value, *or that the sale thereof and the safe and proper investment of the proceeds will inure to the benefit and advantage of the persons entitled thereto* *** the court shall have power pending the happening of the contingency and the vesting of such future interests *** to authorize and direct the sale of such property ***." (Emphasis added.) (This provision has been subsequently amended and transferred to section 17.1 of the Trusts and Trustees Act (Ill. Rev. Stat. 1981, ch. 17, par. 1687.1), but the pertinent language remains the same.)

Appellants argue that despite the explicit language to the contrary, the above statutory provision does not change the standard of necessity enunciated in *Johns*. Appellants rely principally on *Dyer*, a post-1929 case, which cites *Johns* and several other older cases with approval and makes mention of section 50 of the Chancery Act without any comment regarding a change in the conditions necessary before a court will order a sale of trust assets contrary to the terms of a trust.

In *Dyer* the testator left residential property in trust for the use and/or support of his wife and daughters. Part of the property was in an area that was no longer residential and all of the buildings were

old and out of repair so that they were not desirable for residential purposes. The court concluded from the evidence that the price offered for the property was above the normal cash market price and that if the bid was not accepted the trust would lose the opportunity to dispose of the property at an advantageous price. The court specifically did not reach the issue of whether or not the terms of the trust allowed the sale of the property, but apparently made its holding assuming *arguendo* that the sale was not authorized.

While the court reasserted the validity of *Johns*, it went on to say, "[t]he rule which supports an exercise of the power must be based on facts showing that conditions have arisen or exigencies developed which could not have been foreseen by the donor and that as a result of such unforeseen conditions *the beneficiaries will suffer loss.*" (Emphasis added.) (395 Ill. 288, 294-95, 70 N.E.2d 49, 52.) This is obviously a lesser standard than requiring that there be a threat of a total loss of a trust or a frustration of the purpose of the trust.

Why the significance of the 1929 amendment was not noted in *Dyer* is unknown. (See also *Stough; Thorne v. Continental National Bank & Trust Co.* (1958), 18 Ill. App. 2d 163, 151 N.E.2d 398.) However, that need not concern us inasmuch as the court has subsequently spoken to the meaning of the 1929 amendment. In *Shamel v. Shamel* (1954), 3 Ill. 2d 425, 121 N.E.2d 819, all that was in controversy was the sale of mineral rights. The court noted that there was no dispute that without a present sale the trust, and the ultimate beneficiaries, would suffer a total loss of the mineability of the coal within the trust property. Thus, since even prior to section 50 of the Chancery Act the courts of chancery could deviate from a trust instrument when a contingency arose in which the estate of the beneficiaries would be totally lost, the coal rights could be sold. The court went on to say:

> "The amendment of 1929 to section 50 of the Chancery Act *conferred a broader and wider power on chancery courts* than had previously been granted by enlarging the scope of the act so as to permit a sale of lands when it is made to appear that such lands or estate are liable to waste or be depleted in value or that the sale thereof and the safe and proper investment of the proceeds will inure to the benefit and advantage of the persons entitled thereto. *Mere benefit to the beneficiaries was not enough prior to such amendment,* but the necessity for protection or preservation of the estate for prevention of a total loss to the estate had to be established. *The enlarged scope of section 50* of the Chancery Act, as amended, *gives power to the circuit court to authorize the deviation when the evidence*

*shows* that the lands are liable to waste and depreciation in value, or that *a sale will benefit the persons entitled to the estate.*" (Emphasis added.) 3 Ill. 2d 425, 435-36, 121 N.E.2d 819, 825.

Citing *Thorne* and the Historical Notes to section 50 of the Chancery Act (Ill. Ann. Stat., ch. 22, par. 50, Historical Note, at 191 (Smith-Hurd 1968)), appellants contend that the sole purpose of the statute was to confer jurisdiction upon the courts, and it did not establish standards as to when the court ought to exercise its power. It is true that the court in *Thorne* still spoke of the necessity of finding an "emergency." However, it defined emergency in such broad terms, finding that a dispute between the beneficiaries and a pending settlement agreement between them which required a sale contrary to the terms of the trust was an "emergency," that in reality the strict standard which appellants contend for was not followed. Furthermore, *Thorne* did not discuss section 50 of the Chancery Act or its exegesis as found in *Shamel*, and of course it is *Shamel* which controls our disposition. The explicit language of *Shamel* indicates that the 1929 amendment did not merely expand court jurisdiction, but affected the evidence necessary to justify the exercise of judicial power in the relevant matters.

■ Apparently no Illinois decision in a matter like we have here has ever rested solely upon the statutory powers now found in section 17.1 of the Trusts and Trustees Act (Ill. Rev. Stat. 1981, ch. 17, par. 1687.1). (See Thigpen, *Does Inflation Since 1941 Provide Basis For Deviation From Investment Provisions Of Pre-1941 Trusts?*, 50 Ill. B. J. 1100, 1102 (1962).) However, it has previously been noted that the alternative holding found in *Shamel* clearly interprets the 1929 amendment as broadly expanding the powers of the court. (See Schuyler, *Future Interests in Illinois: Current Maturities and Some Futures*, 50 Nw. U. L. Rev. 457, 524 (1955); Werden, *Unfreezing Land Titles*, 1956 U. Ill. L. F. 76, 82.) We agree. We conclude that section 17.1 of the Act empowers the court to order the sale of a trust asset, contrary to the terms of the trust, if it is liable to waste or depreciation in value *or* the sale thereof will inure to the benefit of the persons entitled thereto.

■ We do not construe this power so broadly as to annul all restraints on alienation found in trust instruments, or to allow current beneficiaries to profit at the expense of future beneficiaries (or vice versa). Rather, we think *Dyer, Shamel*, and the statute indicate that judicial intervention is appropriate only when there has been a change in circumstances affecting the trust which was unforeseen by the do-

nor, and any resulting order must be tailored to implement the intention of the donor (see *Stephens v. Collison* (1916), 274 Ill. 389, 395-96, 113 N.E. 691, 694; *Thorne*).

While appellants have vigorously maintained that the emergency conditions required by common law do not exist here; they have apparently conceded that the evidence does show that a failure to proceed with the sale to Kerasotes would result in the loss of an opportunity to sell the Theatre at an advantageous price and would subject the trust to the possibility, if not probability, of loss because of the absence of a prospective tenant financially secure enough to satisfy the co-owner so that she does not proceed to force a partition sale.

■ Indeed the record completely substantiates the trial court's conclusion that there has been a change in conditions in the theatre industry since the establishment of the trust and that absent a sale to someone other than Sylvan, Joan will force a sale through a partition proceeding which would lessen the value of the trust assets and cause the incursion of further legal fees. Appellants have complained of petitioner's failure to advertise the sale of the Theatre. The trial court found that the terms of the sale, at a price substantially above the appraised value, was reasonable and we agree. In any event, appellants have made no argument that the terms of sale are unfair and the fact that better terms hypothetically might be available does not weigh against the conclusion that the trust assets should be sold because of the changed conditions.

Appellants next argue that in determining how to dispose of the Theatre, the court ignored the intent of the trust donor when it failed to accept their proposal to purchase and run the Theatre. As we stated earlier, when disposing of a trust asset contrary to the terms of the trust, the court should attempt to implement the donor's purpose in establishing the trust. We agree with appellants that there is no inference in the will that the donor wished Sylvan to be precluded from owing and/or operating the Theatre, and that clearly the trust was established for the benefit of Sylvan and his family. However, Ruth chose to benefit Sylvan and his family by placing the Theatre in trust and the only management control of the Theatre placed outside of the trustee is a requirement that Sylvan and Joan approve any sale and that *Joan* approve all leases. There is therefore similarly no inference that the donor desired that Sylvan manage the Theatre.

■ While, all things being equal, a sale to some of the beneficiaries rather than to a third party would be preferable, the trustee must manage the trust for the benefit of all potential beneficiaries, including appellants. Apparently appellants did put a significant effort into

developing a plan for operating the Theatre. However, the financial risk involved in operating a "revival" theatre, by individuals with no experience in the theatre industry, are significant. Also, appellants' total dependence on one private source of capital of unknown reliability, and the failure to explain where funds for a down payment would be procured, compound the riskiness of any proposed sale to them. We therefore agree with the trial court's conclusion that a sale by petitioner to appellants would have been a breach of petitioner's fiduciary duty. Furthermore, even if it could be concluded that appellants' offer was as sound as that made by Kerasotes, the fact that Joan would refuse to acquiesce in such a sale and instead would seek partition of the property precluded appellants' offer from being considered a viable alternative.

Appellants' last objection is that the court erred in admitting testimony regarding the mortgage foreclosure upon Sylvan and Mary's residence. Appellants contend that the foreclosure had no bearing on their ability to manage a theatre and was thus irrelevant. We believe that an inability to manage one's own personal finances has a bearing on one's ability to manage a business and was also relevant to show appellants' lack of financial resources to commit to a theatre operation. The testimony was properly admitted.

The judgment of the trial court is affirmed.

Affirmed.

TRAPP and GREEN, JJ., concur.